UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

WILLIE SMITH,

     Plaintiff,

vs.

                                  CASE NO.:  3:13-CV-933-J-32MCR

MARKONE FINANCIAL, LLC,

     Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S [DOC. 68] MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, WILLIE PEARL SMITH, by and through her undersigned counsel, and files this her Response in Opposition to Defendant's [Doc. 68] Motion for Summary Judgment, and respectfully requests this Honorable Court for an Order denying same.

**I.**      **Statement of Material Facts**

In or about November of 2012, Plaintiff's daughter, Kimberly Robinson, applied for financing through Defendant for an automobile loan, and in doing so, identified Plaintiff, amongst others, as a reference and also as her mother and landlord. (DEF002-DEF003).  At all times, Defendant was aware that Plaintiff was not the borrower or co-borrower on the subject account, and it knew the telephone number for the borrower's cell phone was a different number than Plaintiff's cell phone number.  (Johnson Depo., p. 47-48, 50; DEF002-003).  For at least the past three (3) years, Plaintiff was the sole subscriber, regular user and carrier of the cellular telephone number (407)558-4431. (Smith Depo., p. 26-28, 31, 58, & 104).  Plaintiff has never shared her cell phone with any other person, nor ever let anyone else use her cell phone.  (Smith Depo., p. 29, 31, 34 & 58).

The first time that Plaintiff became aware that her daughter had purchased a car and used her name as a reference was when Defendant started to make harassing debt collection calls to Plaintiff's cell phone number. (Smith Depo., p. 34, 36-37). Plaintiff testified that Defendant, and particularly Defendant's representative "A. Soto" never called Plaintiff, never spoke to Plaintiff, and that she never represented to anyone at Defendant that Mrs. Robinson was living with Plaintiff. (Smith Depo., p. 36-37, 39-41). Plaintiff never told anyone affiliated with Defendant that Plaintiff's cell phone number was a good number to call to reach her daughter. (Smith Depo., p. 42 & 104). Mrs. Robinson did not live with Plaintiff at the time of her loan application. (Smith Depo., p. 8, 12-14). Defendant started to make debt collection calls to Plaintiff's cell phone number on Mrs.Robinson's account, and did so during the period of November 7, 2012 through June 14, 2013. (Johnson Depo., p. 33; Def.'s Am. Resp. to Roggs, its attached *ex. "A" & "B"*).

There exists a dispute between the parties as to the number of times Defendant called Plaintiff during the period of November 7, 2012 and June 14, 2013. Defendant utilized both an automatic telephone dialing system, which was its LiveVox Predictive Dialer system, and also made manual outbound calls to Plaintiff's cell phone number over that period of time. (Johnson Depo., p. 24-25, 27-28; Nath Depo., p. 10-11 & 62). The only reason Defendant uses its LiveVox Predictive Dialer system is to make collection calls on an account. (Nath Depo., p. 65). The LiveVox Predictive Dialer is the only predictive dialer that has been used by Defendant. (Nath Depo., p. 22).

Defendant had in effect policies and procedures designed to ensure compliance with the Telephone Consumer Protection Act ("TCPA"). (Johnson Depo., p. 12). In its policies and proecures, it specifically referred to its dialer as an "auto-dialer." (Johnson Depo., p. 12). If a

third-party is being called by Defendant's auto-dialer, Defendant's policy is to first obtain verbal or written consent from that third-party being called, prior to making any calls. (Johnson Depo., p. 16 & 32). Defendant's policies also require its employees to verify whether information like telephone numbers are up-to-date and accurate on an account. (Johnson Depo., p. 17). Defendant instructs its employees to _never_ permanelty remove numbers from being called by its LiveVox Predictive Dialer system. (Johnson Depo., p. 22).

The LiveVox Predictive Dialer works by a list of accounts being uploaded (on a nightly or early morning basis) to the dialer system, which then automatically queues up the list of accounts (or campaigns) to be called for collection purposes the following day. (Nath Depo., p. 17, 19 & 64). This is accomplished by uploading the accounts to be called into a "FTP" ("File Transfer Protocol" – which is similar to the web) and by doing so, the only telephone numbers designated by Defendant in each account as a "cell", "home", or "work" number for the customer gets automatically called by the dialer. (Nath Depo., p. 18 & 20). The dialer automatically calls the telephone numbers for the accounts that are _stored_ on FTP site. (Nath Depo., p. 64, lines 14-21, p. 24). The FTP site is part of the dialer system, and it is the place where the accounts and their designated telephone numbers are loaded or stored. (Nath Depo., p. 21). Autodialer calls made by Defendant's dialer are made without any human involvement. (Nath Depo., p. 26-27). It is not until _after_ the call has been made and then that call either being answered by the person called (or that person's answering machine), that a Mark One collector will even receive notification that a call had been made and answered. (Nath Depo., p. 26 & 57; Peterson Depo., p. 26-27; Campbell Depo., p. 22). The dialer system itself "predicts" when collection agents may be available to pick up a call that has been made by the dialer, and then generates that call and ultimately transfers the call made to a collection agent that may be

available after it is answered.  (Nath Depo., p. 26-27).  The dialer, without any human involvement, also automatically hangs up when a call that has been made by it is picked up by an answering machine.  (Nath Depo., p. 59).

It was purportedly Defendant's collector, Jeremy Plymale, who went by the designation/user code "JP1", that made the conscious decision on March 11, 2013 to designate Plaintiff's cell phone number as a number for the customer/borrower, Kimberly Robinson, that could be called by Defendant's dialer system.   (Johnson Depo., p. 64-65, 73, & 110). Accordingly, at this point, and in addition to manual calls made by collectors, subsequent calls were also made to Plaintiff's cell phone number with its dialer.  (Johnson Depo., p. 73). It is Defendant's belief that Collector Plymale made this decision because contact with the borrower had not been made in some time, and based on his review of the account notes and coming to his own conclusion that consent might have been given to call Plaintiff's cell phone number. (Johnson Depo., p. 65, 68 & 73).  Defendant's collection notes lack detail telling us exactly why Collector Plymale classified Plaintiff's cell phone number as the customer or co-buyer's cell phone number.  (Johnson Depo., p. 65).  Defendant failed to remove Plaintiff's cell phone number as a number that could be called by its dialer on April 17, 2013, despite Plaintiff getting very upset with Defendant and told Defendant's representative that she was not the borrower. (Johnson Depo., p. 78-80, DEF00160).

Defendant's policies require that there only be one (1) telephone number designated in the "cell phone" field of an account, and that number being the number of the actual customer. (Bailey depo., p. 17).  However, early during the collection period (i.e. January 2013) when calls were made to Plaintiff's cell phone number, Defendant's collector, Thomas Maloney, classified Plaintiff's cell phone number as the cell phone number of the actual customer/borrower.

(Maloney Depo., p.19).   On January 18, 2013, Collector Maloney made three (3) calls to Plaintiff's cellular telephone number, designating each entry on that date as "TC TEL CELL" (Maloney Depo., p. 19).   Maloney referred to Plaintiff as the "CU," which is Defendant's abbreviation for Customer", and designated Plaintiff as such in Defendant's account notes. (Maloney Depo., p. 19-20).   He came to the erroneous conclusion that <u>Plaintiff's cell phone number was one in the same as the borrower's number, and that is why he classified the Plaintiff as the actual customer (or "CU") in Defendant's account notes as early as January 18, 2013.</u> (Maloney Depo., p. 19-20, 24 & 25-26).   In Maloney's own words, "Well, once again, I'm looking at the mother's number and the daughter's number being one in the same," and his assumption stayed that way from January, 2013 through the end of his involvement on the account.   (Maloney Depo., p. 25-26, 35).

Following Collector Maloney, Collector Bailey, as early as February 2, 2013, called a number classified as a cell phone number, but could not say which number was actually called. (Bailey Depo., p. 16-17).   Bailey testified that the number she called should be the same because there could only be one (1) number designated in the cell phone field.   (Bailey Depo., p. 16-17). Similarly, any collector calling the number designated as the cell phone number and writes "TC TEL CELL" in the account notes should be calling the same telephone number as the system only identifies one (1) number as the cell phone number. (Maloney Depo., p. 11-12; Peterson Depo., p. 19).   Collector Peterson said that while she did not know who made the determination that a certain number on the account should be classified as the cell phone number for the customer, simply because the number appears in the cell phone field and is designated as a cell phone number, she as a collector assumes it is a proper number to reach the customer. (Peterson Depo., p. 45).   Mark One considers the cell phone number to be a proper number to reach the customer;

and that number can be called up to six (6) times in a given day.  (Peterson Depo., p. 24, 34, & 43).  As of April 24, 2013, Plaintiff's cell phone number continued to be erroneously designated as a cell phone number on the subject account.  (DEF00161, note entry dated 4/24/13).

Defendant estimates it only called Plaintiff's cell phone number fifty-three (53) total times over the period of November 2012 through June of 2013.  ([Doc. 68, p. 7]).  Plaintiff contends Defendant called her cell phone number significantly more that fifty-three (53) times.  (Smith Depo., p. 46, 56-57).  Defendant's estimate of fifty-three (53) calls is inaccurate because it is based on what is documented in its autodialer call report and its own estimate of calls taken from its account notes. (See Def.'s Am. Resp. to Roggs., *ex. "A" & "B"*, and DEF00119-00189).

For the time period of February 1, 2013 through May 6, 2013, Plaintiff kept her own handwritten log of some of the Defendant's calls she received over that time period.  (Smith Depo., p. 44-45, and its attached *ex. "3"*; Smith II Depo., p. 8-11, and its attached *ex. "4"*).  Plaintiff documented the date and time of Defendant's phone calls and the number Defendant was calling from.  (Smith Depo., p. 45).  This log was taken directly from her cell phone, and also based on her own recollection of the names disclosed by the collectors with whom she spoke.  (Smith Depo., p. 45, 53-54, 86-88, & 107).  Plaintiff wrote down the names of the collectors she spoke to on her call log (i.e. Taryn, Debbie, Jeffrey, Ms. Peterson, and Jeremy).  (Smith Depo., p. 53-54, and *exhibit "3"*, Smith II Depo., *ex. "4"*).  Each of these individuals are Mark One collectors that made outbound calls to Plaintiff's cellular telephone number over the relevant period and spoke to Plaintiff.  (Johnson Depo., p. 8, 110; Peterson Depo., p. 14, Moore Depo., p. 15 & 18).  Plaintiff's own handwritten log shows that Defendant called her cellular telephone number at least twenty-three (23) times over that period of time. (Smith Depo., p. 44-45, and its attached *exhibit "3"*; Smith II Depo., p. 8-11, and its attached *ex. "4"*).  However, significantly,

Defendant's records of its calls <u>omit at least thirteen (13) calls made by Mark One during that same period</u>. (*Compare* Smith Depo., p. 44-45, and its attached *exhibit "3"*; Smith II Depo., p. 8-11, and its attached *ex. "4"* vs. Def.s Am. Resp.to Roggs, *ex. "A" & "B"*, and DEF00119-DEF00189).

Defendant's records of its calls <u>omit</u> the following dates and times of its calls to Plaintiff's cellular telephone number: April 3, 2013 (12:39 pm), March 3, 2013 (8:55 pm), March 7, 2013 (8:09 pm), March 13, 2013 (12:39 pm), March 16, 2013 (7:55 pm), February 1, 2013 (8:53 am), February 7, 2013 (3:06 pm), February 12, 2013 (1:55 pm), February 15, 2013 (8:55 am), April 11, 2013 (2:19 pm), April 16, 2013 (7:57 am); April 25, 2013 (1:57 pm), April 25, 2013 (8:13 pm). (*Id.*) Plaintiff testified that Defendant called her cell phone every day or every other day, and two to three times a day. (Smith Depo., p. 46 & 56-57). <u>Each time</u> Plaintiff was called and spoke to Defendant, she told Defendant that her daughter did not live with her and to <u>stop calling her</u>. (Smith Depo., p 54-55, 97). Plaintiff testified, and her own handwritten call log corroborates, that she told Defendant to stop calling her during conversations on at least the following dates and times: March 16, 2013, March 31, 2013 (at 6:55 pm), on April 1, 2013 (at 8:52 am), on May 6, 2013 (at 8:47). (Smith Depo., p. 96-99, *ex."3"*).

Defendant's representatives and its autodialer harassed her and called her constantly. (Smith Depo., p. 21). Defendant made Plaintiff feel like it was her obligation to pay her daughter's bill. (Smith Depo., 24, 63-64). Defendant's representatives called her so much knowing she was not responsible for this debt, to the point of aggravation, and physical illness. (Smith Depo., p. 47, 59-60, 63-64 & 106). Defendant made Plaintiff feel like she was being interrogated, and as if she was lying to them. (Smith Depo., p. 98, 101). Defendant's representatives even told her her name was "on the paper" as if to insinuate that that placed some

sort of burden or onus on the Plaintiff concerning this debt. (Smith Depo., p. 104-105). Collector Bailey even told Plaintiff on February 20, 2013 that she knew this was not Plaintiff's issue, yet Defendant continued to call her for another approximate four (4) months. (Bailey Depo., p. 33-34). Defendant concedes that its account notes may not track all of the calls it made to Plaintiff on the subject account. (Johnson Depo., p. 40-41, 53). This is because the accuracy and detail of the Defendant's account notes is wholly dependent on the accuracy in which Defendant's collectors documented such activity. (Johnson Depo., p. 40). Defendant's account notes do not keep track of all of its autodialer calls made with its LiveVox Predictive Dialer system. (Johnson Depo., p. 41 & 53). Manual calls made by Defendant's collectors only appear in the account notes if a collector chooses to document the account notes with such activity. (Johnson Depo., p. 41).

In addition to Defendant's estimate of fifty-three (53) being inaccurate because many calls made were not documented by the collector when the call was placed, Defendant's Account Notes reflect several mistakes in the collectors' classifications of the numbers that it actually called during the relevant period. (See DEF00119-DEF00189). When an outbound call is made, it should be reflected in Defendant's Account Notes with a note-title lead-in or heading such as "TC Tel Cell", "PR Phoned Reference", "RC Phoned References," "TE Telephoned Work," "TR Telephoned Reference", "TO Telephoned Other", "RF Reference," and "TR Telephoned Residence." (DEF00119-DEF00189; Johnson Depo., p. 102-104; Bailey Depo., p. 13, 21). Not every collector identified the actual phone number called in their respective note entries. (DEF00119-DEF00189). Moreover, those collectors that did document the digits of the phone number they called, did not so uniformly throughout their involvement on the account. (Peterson Depo., p. 33). Collector Peterson could not answer why some of her note entries detailed the last four digits of the telephone number she actually dialed, while other of her note entries did not.

8

(Peterson Depo., p. 33).  Defendant's estimate of only fifty-three (53) calls does not include all of the outbound calls made to the telephone number designated in the account notes as "TC Tel Cell."  As a for instance, Defendant contends only one (1) call was made to Plaintiff's cell phone number on January 18, 2013, and that it was a manual call.  (See Def.'s Am. Resp. to Roggs., and its *ex.'s "A" & "B"*).  Collector Maloney, the actual caller on that day, testified that he made three (3) calls to the Plaintiff's cell phone number on January 18, 2013.  (Maloney Depo., p. 20). Defendant's account notes corroborate Collector Maloney's testimony as they show a total of three (3) calls only he made to the number designated as the cell phone number, and each one of Collector Maloney's entries that day designated each action as "TC TEL CELL."  (DEF00126).

Evidencing other instances of erroneous account notes entries is the entry on April 17, 2013, in which the Collector "JTR" (Joanne Roberts or Jane Roper) documented her outbound call to Plaintiff's cell phone number, and corresponding note entry, as "TE TELEPHONED WORK"; improperly classifying Plaintiff's cell phone number as the phone number of the borrower's employer.  (DEF00160; Barksdale Depo., p. 29-30 ).  It was on this date that Defendant's representative's documented that Plaintiff was upset with Defendant's calls and told Defendant that she was not the borrower.  (DEF00160).  It was on this date that Defendant's account notes indicate it was supposed to removed Plaintiff's cell phone number (407)558-4431 from its call list; however, calls continued to Plaintiff's cell phone number <u>continued</u> until June 14, 2013.  (DEF 00160; Johnson Depo., p. 85-86).

On April 25, 2013, Collector Shanterica "Taryn" Moore called Plaintiff's cell phone number and designated that call as "TC TEL CELL".  (Moore Depo., p. 15; DEF00162).  There is no mistaking that "Taryn's" call that day was made to Plaintiff's cell phone number as Plaintiff had documented that call on her own call log, and further documented that she spoke to

"Teryn". (Smith Depo., p. 98, and its attached *exhibit "3"*; Smith II Depo., p. 8-11, and its attached *exhibit "4"*). This call is another example of a call not included in Defendant's estimate of fifty-three (53) calls. (Def's Am. Resp. to Roggs., its attached *ex.s "A" & "B"*). During the April 25, 2013 conversation, Plaintiff told Collector "Taryn" that the number they were calling was <u>her</u> telephone number and to stop calling, even threatening to call a lawyer. (Moore Depo., p. 15; DEF 00162). Collector "Taryn" lacked the authority to remove any number from an account so that it would not be called, so she forwarded Plaintiff's request to not be called to her supervisor, Debbie Proctor. (Moore Depo., 15). Ms. Proctor failed to remove the Plaintiff's number and instead, actually removed the cell phone number of the actual borrower, Kimberly Robinson (321)696-4078! (Moore Depo., p. 17; DEF 00162-00163). And of course, Defendant's calls to Plaintiff continued until June 14, 2013.

Defendant's collection practices policies and procedures require Defendant's employees to specifically notate the account notes with the code entry "OK2CC," indicating it is "Okay To Call Cell" number. (Johnson Depo., p. 12, 37, and its *attached ex. "11"*). Defendant's account notes lack any mention of this code-entry "OK2CC" in any respect with regard to Plaintiff's cell phone number. (DEF00119-DEF00189). Defendant concedes that its collectors may make mistakes and omit such documentations in the account notes. (Johnson Depo., p. 38). This is possibly due to lack of training. (Campbell Depo., p. 12-14). Defendant's policies specifically instruct on the federal Fair Debt Collection Practices Act ("FDCPA"), as well as instruct on the manner and frequency of calls and communications to and with non-borrower third-parties such as relatives and references. (DEF0020-DEF0029, DEF0036-DEF0040, DEF0080, and DEF0099). Defendant's policy with regard to contacting a third-party references and/or relatives requires that if a reference or relative requests that Defendant no longer contact them, Defendant

10

must abide by that request.  (Johnson Depo., p. 98-99; DEF 0080; Bailey Depo., p. 9; Maloney Depo., p. 10; Peterson Depo., p. 9 & 11; Campbell Depo., p. 13-14, & 30).  No more than two (2) calls should be made to a reference or relative in a single day, one in the morning, and once after 6:00 pm; and if contact is made with a third-party live a reference or relative, no further calls should be made to that third-party for at least one (1) week.  (DEF0064; Bailey Depo., p. 6; Maloney Depo., p. 7-8; Peterson Depo., p. 8).  Because references are not customers, there's no reason to call them on a daily basis.  (Campbell Depo., p. 12-13).

Collectors have the ability to review account notes to see when the last time a reference and/or relative had been called so that more than the restricted number of calls to third-party references or relatives do not occur.  (Johnson Depo., p. 51-52; Maloney Depo., p. 9; Campbell Depo., p. 16).  However, despite that policy, Defendant made calls and spoke to Plaintiff on February 18, February 19 and February 20, 2013.  (Bailey Depo., p. 29-30).  Collector Bailey's "reason" for violating this policy was because she was desparate to try to get in touch with the borrower at that time.  (Bailey Depo., p. 30-31).  She admits she violated Defendant's collection practice policy and procedure related to third-party call frequency.  (Bailey Depo., p. 31).  Collector Maloney similarly violated that policy on his three (3) calls on January 18, 2013, coupled with his calls on January 19 and 21, 2013.  (Maloney Depo., p. 20-21).

II.     **Law and Argument**

   A. Plaintiff is an Alleged Debtor and Summary Judgment is Improper on FCCPA Claims

   1. *Plaintiff is an "Alleged Debtor"*

Defendant, again, seeks summary judgment as to Plaintiff's FCCPA claims, without distinction, on the grounds that Plaintiff was not a "debtor" under the Act.  (See [Doc. 68, p. 13, fn. 3]).  On November 25, 2013, this Court entered its [Doc. 37] Order adopting the [Doc. 35]

11

Report and Recommendation of the Magistrate Judge as the opinion of the Court.  Defendant then, and now, takes the position that only the actual contractually obligated person has standing to pursue claims for violations of the FCCPA.  The statute does not restrict its reference to illegitimate debts to debt that were potentially incurred by the actual contractually-obligated party, but then subsequently determined to be illegitimate.  This debt was at all times illegitimate as to the Plaintiff, a fact known to Defendant from day one (1).  Further, the [Doc. 35] Report and Recommendation points out that there has never been in this case a contention that Plaintiff owed the Defendant a debt, but rather, that Plaintiff was an alleged debtor.  ([Doc. 35, p. 4]).  As stated in the [Doc. 35] Report and Recommendation, "In the instant case, Defendant placed calls to the Plaintiff in the mistaken belief she was Kimberly Robinson."  The facts of this case as developed through discovery, bear out that exact fact.

Collector Maloney conceded that he designated the Plaintiff as the "CU," or customer, treating the Plaintiff as the customer on the account, treating the Plaintiff's cell phone number and the actual customer's number as one in the same, and doing so at least as far back as January 18, 2013.  Collectors Bailey and Peterson did the same thing when they were placing debt collection calls to Plaintiff's cellular telephone number in February and March, 2013.  Collector Jeremy Plymale did the exact same thing, when he classified Plaintiff's cell phone number as the number for the customer/borrower on March 11, 2013.  Defendant made the conscious decision to treat Plaintiff as the customer to be called to collect on this account, even with its LiveVox Predictive Dialer system.  At all times, by its conduct, Defendant made Plaintiff feel that she was obligated to pay this debt, knowing she was never contractually obligated to do so.  It is undisputed that Defendant also called Plaintiff's cell phone number with its LiveVox Predictive dialer system, an autodialer used only to place collection calls on an account.  (Nath Depo., p.

12

10-11, 65).

As acknowledged previously by this Court in its [Doc. 37] Order and [Doc. 35] Report and Recommendation, citing to *Halston v. Target National* Bank, 2:13-cv-287, 2013 WL 3804844, at *4 (M.D. Fla. July 19, 2013), even an individual who was not an alleged debtor with respect to F.S. § 559.72(7), still has standing to bring his claims under F.S. § 559.72(9).  Even moreso here, when Defendant continued to call Plaintiff despite Plaintiff's repeated requests to stop calling, and despite Plaintiff constantly informing Defendant that she was not the borrower. This Court has already disagreed with Defendant's argument that a Defendant must specifically state that the person called that she owed or allegedly owed it a debt in order to have standing. ([Doc. 35, p. 7]). The court in *Desmond v. Accounts Receivable Management, Inc.*, 72 So.3d 179 (Fla. 2d DCA 2011) ruled that a "debtor" as that termed is defined in FCCPA provision F.S. 559.55(2) is "any natural person … allegedly obligated to pay any debt," and that someone who, in fact does not owe the debt is an alleged debtor who is "…protected by the Act from the prohibited practices set forth in this subsection." *Desmond*, 72 So.3d at 181.  "Because the context of subsection 559.72(7) does not indicate otherwise, an alleged debtor is protected by the act from the prohibited practices set forth in this subsection." *Desmond v. Accounts Receivable Management, Inc.*, 72 So.3d 179 (Fla. 2d DCA 2011); see also, *Fini v. Dish Network, LLC*, 6:12-cv-690. 2013 WL 3815627 (M.D. Fla. Mar. 6, 2013), *Campanale v. Capital One Services, LLC*, 8:11-cv-2490-T-MSS-EAJ.

Plaintiff deserves just as much protection under the act as the person who is actually contractually obligated to pay the debt.  Defendant made the conscious decision dating as far back as January 18, 2013 to treat Plaintiff as "one in the same" as Mrs. Robinson, and there is no reason to do so differently now.  To argue that only the actual contractually obligated party is a

13

"debtor" with standing to pursue claims under the FCCPA would render other language within F.S. § 559.72 (i.e. F.S. § 559.72(9)) meaningless. The FCCPA is to be construed in a manner that is protective, not restrictive, of the consumer. See *Harris v. Ben. Fin. Co. of Jax.*, 338 So.2d 196, 200-201 (Fla. 1976), *Laughlin v. Household Bank, Ltd.*, 969 So.2d 509 (Fla. 1st DCA 2007), and F.S. § 559.552.

### 2.   *Summary Judgment on Plaintiff's F.S. § 559.72(7) Claims is Improper*

Plaintiff has testified that Defendant called every day or every other day and up to three (3) times a day, and that Defendant continued to call her after she repeatedly told Defendant to stop calling. Defendant concedes that it continued to call Plaintiff even after she told them to stop calling. Defendant's estimate of fifty-three (53) calls is completely wrong and understated. There is no dispute that Defendant continued to call Plaintiff on a debt she did not owe after she told them to stop calling. There is a factual dispute on the number of calls made by Defendant. *Elliot v. GC Services,* LP, 2011 WL 5975671 (M.D. Fla. 2011), and *Dokumaci v. MAF Coll. Svc.*s, 2011 WL 833988, *3 (M.D. Fla. 2011). Plaintiff further testified that Defendant's collector's interrogated her contantly, intimidated her, and made her feel as if she was lying and responsible for paying a debt she did not owe. Accordingly, Plaintiff's F.S. § 559.72(7) claims are based on much more than mere call frequency; they are based on willful call frequency <u>and</u> willful "other conduct." F.S. § 559.72(7). However, it is significant that the call frequency employed by Defendant here is greater than the call frequency of eighteen (18) calls over a three (3) month period that was found to be insufficient in *Desmond v. Accounts Receivable Mgmt.*, 72 So.3d 179 (Fla. 2d DCA 2011) or *Schauer v. Morse Operations, Inc.*, 5 So.3d 2 (Fla. 4th DCA 2009). Such a call frequency is sufficient to present to a jury on this issue, especially when considering the additional factors of Plaintiff's repeated efforts to get Defendant to stop the calls

14

coupled with the totality of Defendant's conduct toward Plaintiff. *Story v. J.M. Fields*, 343 So.2d 675, 677 (Fla. 1st DCA 1977).

In *Story v. Fields*, 343 So.2d 675 (Fla. 1st DCA 1977), the court stated that: "proof of almost daily <u>calls</u> amounting to more than 100 in a five-month period, which <u>calls</u> continued after debtor told creditor's representative to quit calling and go to court, was sufficient to go to the jury on issue of actual damages." *Id.* at 675, 676-7. In fact, in *Story*, **the plaintiff there admitted that he returned only some, but not all of the defendant's calls, and that the overwhelming vast majority of calls made by defendant were simply unanswered calls, without an actual conversation**. *Id.* at 676. In *Story*, like here, the calls came at a frequency of two (2) to three (3) calls a day, continued after being told to stop, and knowing the reasons for non-payment. Finally, there is no question that Defendant's conduct was willful. *Story v. J.M. Fields, Inc.*, 343 So.2d 675 (Fla. 1st DCA 1977)(citing to *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933) and *Dezell v. King*, 91 So.2d 624, 626 (Fla. 1956

### 3. *Summary Judgment on Plaintiff's F.S. § 559.72(9) Claim is Improper*

At all timed Defendant was aware that this particular debt was never owed by Plaintiff, and was not a legitimate debt as to Plaintiff. Despite that knowledge, Defendant continued to make collection calls to Plaintiff concerning this debt, even after being told she did not know where her daughter was living and to stop calling. Defendant intimidated Plaintiff and made Plaintiff feel as if she was responsible for paying this bill. At least three (3) times in Defendant's own account notes it is documented that Plaintiff told Defendant she did not know where the actual debtor was living and/or that Plaintiff was not the borrower, yet Defendant's calls continued.

### B. <u>Defendant's Motion Should Be Denied With Respect to (Count I) TCPA</u>

*1. Defendant Lacked Plaintiff's Prior Express Consent*

The only defense to a violation of 47 U.S.C. § 227(b)(1)(A)(iii) is "prior express consent," a burden of the Defendant to establish. *Hicks v. Client Srvc.s, Inc.*, 2009 WL 2365637 (S.D. Fla. 2009), *Buslepp v. B & B Entmn't., LLC*, 2012 WL 4761509 (S.D. Fla. 2012), and *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012). However, this defense is not available to Defendant, because Plaintiff never provided her "prior express consent" to receive Defendant's calls. Defendant's argument is based on the contention that Plaintiff voluntarily released her phone number to Defendant, a fact Plaintiff adamantly denied. In order for the defense of prior express consent to apply, the called party must have provided his number to the calling party during the transaction that resulted in the debt owed. *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 564-65, 2008 WL 65485 (Jan. 4, 2008). (hereinafter "*2008 FCC Ruling*"). The TCPA gives the Federal Communications Commission ("FCC") the authority to prescribe regulations and implement the TCPA's provisions. 47 U.S.C. § 227(b)(2). On January 4, 2008, the FCC adopted Declaratory Ruling 07-232, which stated, in pertinent part, as follows: "We emphasize that prior express consent is deemed to be granted only if the **wireless number was provided by the consumer** to the **creditor**, and that such number was provided **during the transaction that resulted in the debt owed**." 2008 FCC Ruling, at 564-65. (emphasis added). *See also, Adamcik v. Cr. Cntrl Servs., Inc.*, 832 F.Supp.2d 744, 748 (W.D.Tex.2011).

Plaintiff never owed this debt, and she denied speaking to the representative, "A. Soto", the person purportedly who took down Plaintiff's cell phone number as a reference and/or relative and the landlord of Kimberly Robinson; and further denied ever telling anyone affiliated with Defendant that her cell phone number was a good number to reach Kimberly Robinson. Not only has Defendant failed to demonstrate that the wireless number was provided by Plaintiff

at any time and to whom this number was allegedly provided, there is absolutely no evidence in the record establishing that the number was provided "during the transaction that resulted in the debt owed," by Plaintiff, ever. *2008 FCC Ruling*, 23 FCC Rcd, 564. Moreover, Defendant has policies in place defining and instructing its employees on what *it considers* consent and how to obtain consent to make autodialer calls. Those policies mandate obtaining verbal or written consent from the party actually being called, here Plaintiff, prior to making such calls with its autodialer. (Johnson Depo., p. 12, 16-17, 32). Here, Plaintiff never gave such consent.

2. Any Alleged "Consent" Defendant Believed it Had was Repeatedly Revoked

Omitted from Defendant's [Doc. 68] Motion is any refence to the recent Eleventh Circuit decision of *Osorio v. State Farm Bank,* 13-10951, _ F.3d _, 2014 WL 1258023 (11th Cir. March 28, 2014). In *Osorio*, the Eleventh Circuit, joining the Third Circuit in *Gager v. Dell Financial Services*, 727 F.3d 265 (3d. Cir. 2013) as the only two circuit courts to address the issue of revocation of consent. The *Osorio* court held that it is "presume[d] from the TCPA's silence regarding the means of providing or revoking consent that Congress sought to incorporate 'the common law concept of consent.'" *Id*. at p. 23 (citing *Gager*, supra, 727 F.3d at 270; *Neder v. United States*, 527 U.S. 1, 21 (1999). In support of its decision that revocation under the TCPA need not be in writing, the court observed statements from Senator Ernest "Fritz" Hollings, and held that "[f]rom this statement, one can infer that Congress intended for the TCPA to incorporate the common-law meaning of consent, including its revocation." *Id*.

In concluding that consent under the TCPA may not only be revoked, but may be done so verbally, the *Osorio* court held that "allowing consent to be revoked orally is consistent with the 'government interest articulated in the legislative history of the Act [that] enable[es] the recipient to contact the caller to stop future calls.'" *Id*. (quoting *Maryland v. Universal Elections, Inc.*, 729

F. 3d 370, 376-77 (4th Cir. 2013)). Indeed, as the court observed in so concluding, "Senator Hollings, the TCPA's sponsor, described these calls as 'the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed, they hound us until we want to rip the telephone out of the wall.'" *Id.* (quoting 137 Cong. Rec. 30, 821 (1991)). In *Hitchman v. Nat'l Enter. Sys., Inc.*, 12-61043-CIV, 2014 WL 912363 (S.D. Fla. March 10, 2014), the court found that "[i]t appears a majority of courts conclude that consent may be revoked under the TCPA, and that if messages continue after consent is revoked, those messages violate the TCPA." Id. at *2 (citing Gager, supra, 727 F.3d at 268–272; *see also, Beal v. Wyndham Vacation Resorts, Inc.*, 956 F.Supp.2d 962, 977 (W.D.Wis.2013), *Adamcik v. Credit Control Servs., Inc.*, 832 F. Su pp.2d 744, 749 (W.D.Tex.2011), *Gutierrez v. Barclays Group*, 2011 WL 579238 (S.D.Cal.2011). Plaintiff repeatedly told Defendant not to call her, and used words to illustrate to Defendant that she was not amendable to receiving calls.

   3.   Defendant's LiveVox Predictive Dialer was an Automatic Telephone Dialing System

   In 2003, the FCC adopted rules addressing the technological advances made by the telemarketing industry. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order,* 18 F.C.C. Rcd. 14014, 14017 ¶¶ 1–2, 2003 WL 21517853 (F.C.C. July 3, 2003) (*"2003 Report"* ). The FCC sought to ensure that consumers continued to receive the protection from unwanted solicitation calls that Congress intended in enacting the TCPA. *2003 Report* at 14017 ¶ 2. Recognizing the proliferation of predictive dialer use in telemarketing, the FCC in 2002 had invited comments on whether predictive dialers fall within the restrictions placed on ATDS's. *See 2003 Report* at 14090 ¶ 129. A predictive dialer is defined as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *2003*

*Report* at 14091 ¶ 131. Moreover, "[t]he hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers." 2003 Report* at 14091 ¶ 131 (emphasis added).   The FCC acknowledged that the "basic function" remained the same—namely, "the *capacity* to dial [phone] numbers [en masse] without human intervention" or oversight. *2003 Report* at 14092 ¶ 132.   In 2008, the FCC issued a Declaratory Ruling reaffirming that "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling,* 23 F.C.C. Rcd. 559, 556 ¶ 12, 2008 WL 65485 (F.C.C. Jan.4, 2008) (*"2008 Declaratory Ruling"* ); see also, *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012), *cert. denied,* --- U.S. ---, 133 S.Ct. 2361 (2013), *Swope v. Credit Mgmt., LP,* No. 12CV832, 2013 WL 607830 at 4 (E.D. Mo. Feb. 19, 2013), and *Vance v. Bureau of Collection Recovery, LLC,* No. 10-cv-06324, 2011 WL 881550 at 2 (N.D. Ill. March 11, 2011).

In *Echevvaria v. Diversified Consultant, Inc.,* 2014 WL 929275 (S.D. New York Feb. 28, 2014), the court had the opportunity to analyze the exact same automatic telephone dialer system, the LiveVox Predictive Dialer system, that was utilized by Defendant to make its autodialer calls to Plaintiff's cell phone number. The court concluded that that dialer system was an automatic telephone dialing system. *Id.* at *5-*7.  Defendant's dialer system, which every representative of Defendant refers to as an "auto-dialer, functioned in the exact same manner as the dialer system functioned in the *Echevvaria* case.  (Nath Depo., p. 17-21, 26-27, 57-59).  The dialer system dials numbers automatically that have been stored on the FTP site of the dialer, and the only time human intervention ever comes into play is <u>after</u> the call is dialed, <u>after</u> the dialed

call is answered, and _after_ Defendant's collector is notified or "prompted" that a call has been answered. (Nath Depo., p. 17-21, 26-27, 57-59; Affidavit of Jeffrey Hanson). Additionally, in _Hicks v. Client Services, Inc._, 2009 WL 2365637 (S.D. Fla. June 9, 2009), the court ruled that the dialer system used, even though that defendant attempted to describe it as "non-predictive," was the type of device the FCC contemplated in its ruling on predictive dialers. _Id_. at *5.

     C. Punitive Damages and Attorneys' Fees.

     Plaintiff concedes that attorneys' fees are not recoverable under her TCPA claims. Defendant [Doc. 68] attacks the legal basis, and not the factual basis, for seeking punitive damages in this action. Plaintiff's TCPA claim is a civil action, and there is nothing in the TCPA that prevents punitive damages from being imposed. Just because the TCPA affords a right to receive up to treble damages, such a right does not supplant the right to recover punitive damages. The Eleventh Circuit, in _Alea London Ltd. V. American Homes Services, Inc._, 638 F.3d 768, 778 (11th Cir. 2011), discussed whether treble damages should be considered either compensatory or punitive in nature and ultimately concluded that "the TCPA's treble damages provision falls more on the compensatory than the punitive side." _Id_. at 779. See also _Lyons v. Dish Network, LLC_, Case No. 3:12-cv-199-J-32MCR (M.D. Fla July 18, 2012)(Doc. 23)(allowing leave to amend complaint to seek punitive damages in a TCPA case).

III.    **CONCLUSION**

     For the foregoing reasons, the Defendant's [Doc. 68] Motion for Summary Judgment should be denied in all respects.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April __15__, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participants:   William J. Denius, Esq., Kilgore, Pearlman, Stamp, Ornstein & Squires, P.A.. 2 South Orange Avenue, 5th Floor, Orlando, FL  32801.

Michael J. Vitoria, Esquire
Morgan & Morgan, Tampa,  P.A.
One Tampa City Center
Tampa, FL 33602
Tele:  (813) 223-5505
Fax:  (813) 223-5402
MVitoria@ForThePeople.com
KReynolds@ForThePeople.com
Florida Bar #:  0135534
Attorney for Plaintiff